UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| -v.- | S1 18 Cr. 528 (JMF) |
| HUBERT DUPIGNY, | |
| Defendant. | |

**THE GOVERNMENT'S SENTENCING SUBMISSION**

AUDREY STRAUSS
United States Attorney for the
Southern District of New York

Mollie Bracewell
Elinor Tarlow
Jacob Gutwillig
Michael Herman
Assistant United States Attorneys
*Of Counsel*

## <u>TABLE OF CONTENTS</u>

BACKGROUND..................................................................................................................3

   I. The Defendant's Offense Conduct.........................................................................3

   II. The Presentence Investigation Report and The Defendant's Objections............11

DISCUSSION ...............................................................................................................22

   I. A Guidelines Sentence Is Appropriate................................................................22

      A. The Nature and Seriousness of the Defendant's Crime................................23

      B. The Need to Avoid Unwarranted Sentencing Disparities............................24

      C. The Need for Deterrence and Just Punishment............................................28

   II. The Defendant's Arguments Do Not Merit a Non-Guidelines Sentence............30

      A. The Defendant's Personal History and Circumstances Do Not Warrant a Below Guidelines Sentence................................................................................................30

      B. The Defendant's Pre-Trial Conditions of Confinement Do Not Support a Dramatic Downward Variance ............................................................................................31

      C. The Defendant's Offense Does Not Merit a Below Guidelines Sentence.....................33

CONCLUSION...............................................................................................................37

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

HUBERT DUPIGNY,

Defendant.

S1 18 Cr. 528 (JMF)

The Government respectfully submits this memorandum in advance of defendant Hubert Dupigny's sentencing, which is scheduled for June 24, 2021. The defendant trafficked minor victims who were runaways from the foster care system—victims who were half his age and did not have permanent homes or families to take care of them. The defendant took photographs of them in lewd positions, instructed them to drink and smoke to "get into the working mode," and sold them to strangers for sex, as many as ten to fifteen customers each day. When they disobeyed his orders, he used force: he choked and smacked one victim; he pulled out a gun on another victim.

After trafficking his victims for several months, the defendant was incarcerated for an unrelated offense. He continued his sex trafficking scheme even while in jail, enlisting his friends and family to monitor the victims as they had sex for money and to ensure that they sent him portions of their profits. In January 2020, the defendant proceeded to trial in this case and was convicted of three counts relating to his sex trafficking. The Government submits that, in light of the seriousness of the defendant's offense, the need for general and specific deterrence, and in order to achieve just punishment, the Court should impose a term of imprisonment within the applicable United States Sentencing Guidelines ("U.S.S.G") range of 360 months to life imprisonment.[1]

---

[1] The Government respectfully requests 90 days to submit any restitution requests to the Court.

## BACKGROUND

### I.      The Defendant's Offense Conduct

On December 11, 2018, a grand jury returned Superseding Indictment S1 18 Cr. 528 (JMF) (the "Indictment") charging the defendant in four counts: one count of conspiracy to sex traffic minor victims, through force, fraud, and coercion, in violation of Title 18, United States Code, Section 1594(c) (Count One); and three counts of substantive sex trafficking of a minor victim through force, fraud and coercion in violation of Title 18, United States Code, Sections 1591(a), (b)(1), (b)(2), and 2, with respect to Victim-1 (Count Two), Victim-2 (Count Three), and Victim-3 (Count Four).

In January 2020, the defendant proceeded to trial.  Two of the victims—Victim-1 and Victim-3—testified.  (Trial Tr. ("Tr.") 141-328 (Victim-1), 536-593 (Victim-3).)  Those victims described, as detailed below, that they and Victim-2 (the "Victims") engaged in sex trafficking for the defendant.  Their accounts were corroborated by additional evidence at trial, including advertisements the defendant posted that featured the Victims; testimony from Hensley Dupigny, the defendant's half-brother and co-defendant, who testified pursuant to a cooperation agreement with the Government; the defendant's own statements on recorded prison calls; and communications from the defendant's phone.  The evidence proved that, from in or about August 2016 up to in or about May 2017, the defendant recruited, advertised, harbored, and profited from the sex trafficking activities of multiple minor victims.[2]

---

[2] As described below, although the defendant was acquitted of Count Three at trial, the Government respectfully submits that there is more than sufficient evidence for this Court to find, by a preponderance of the evidence, that the defendant trafficked Victim-2 and to include Victim-2 in calculating the applicable Guidelines range.  *See United States. v. Watts*, 519 U.S. 148 (1997).

In particular, the evidence at trial showed that, in approximately July 2016, Victim-1 met the defendant, who she referred to as "Fox," in Brooklyn, New York.  (Tr. 144, 162.)  The defendant was "flirtatious" with Victim-1 and exchanged phone numbers with her.  (*Id.* 145-46.) Victim-1 remained in communication with the defendant through the next several weeks.  At the time, Victim-1 was 16 years old and in the custody of the New York City Administration of Children's Services ("ACS").  (*See* GX 401; Tr. 143, 326.)  Victim-1 explained to the defendant over the phone that she had run away from foster care, that she "needed somewhere to stay" because she was "homeless," and that she needed "some way to make some money."  (Tr. 147-48.)  The defendant informed Victim-1 that he "wasn't a trick"—he would not pay her for commercial sex acts—but that he could "help [Victim-1] make some money" by helping her engage in prostitution.  (Tr. 147.)  In the days that followed, the defendant worked to find customers for Victim-1.  On July 30, 2016, for example, the defendant sent Victim-1 a text message that he had found "3 tricks" (three customers who wanted sex).  (GX 704; Tr. 150-53.)  After Victim-1 failed to respond for several minutes, the defendant grew frustrated, replying "I lined it up for y'all and yall playing. . . .  I don't want these dudes to leave. . . .  I'm over here promoting y'all like crazy."  (*Id.*)

The defendant also informed Victim-1, who was still homeless, that she could come live with him.  (Tr. 170-72.)  Victim-1 left her foster care placement because she had "nowhere else to go" and went to stay with the defendant at a particular residence he controlled in Brooklyn, New York on Midwood Street (the "Midwood Residence").  (Tr. 169.)  On August 3, 2016, Victim-1 sent photographs of herself in sexually explicit poses to the defendant by text message.  (*See* GX 109, 110, 704; Tr. 154-55.)  Shortly thereafter, the defendant began posting advertisements for Victim-1 on Backpage.com, a website that featured advertisements for commercial sex services

and has since been taken down by law enforcement.  (Tr. 166, 168; GX 302.)  Those advertisements included the same photographs of Victim-1 in sexually explicit poses that Victim-1 had sent to him by text message.  (*See* GX 302, 308, 704.)  The defendant featured in the advertisements that Victim-1 was "NEW," "ready to play," and available for customers who were looking for "the special ebony vixen."  (*See id.*)  The defendant subsequently listed that Victim-1 would be willing to perform "in calls"—sexual services at Victim-1's location—or "out calls"—sexual services at the customer's preferred location.  The advertisements listed specific prices for the amount of time and sexual services that Victim-1 would perform.  (*See, e.g.*, GX 336; Tr. 177.)

Soon after she arrived, the defendant had Victim-1 work as a prostitute at various locations in Brooklyn, New York, including the Midwood Residence.  Victim-1 met customers who responded to the defendant's advertisements, seeing as many as ten to fifteen customers each day.  (Tr. 185.)  Victim-1 was required to provide the defendant with the money that she earned and had to rely on the defendant to provide her with food and clothing.  (Tr. 186, 555.)  Victim-1 was not able to leave the house whenever she wanted because the doors would "lock[] from the inside" and the defendant did not give Victim-1 a key.  (Tr. 208.)

At some point after Victim-1 began living with the defendant, in approximately August 2016, Victim-1 was in communication with Victim-2, who she had met in the social services system.  Victim-2 was 17 years old and pregnant at the time.  (*See* GX 402.)  Victim-1 discussed with Victim-2 that they could both make money by engaging in prostitution for the defendant.  (Tr. 190-91.)  Victim-2 agreed to an arrangement where she would work as a prostitute and provide a portion of her proceeds to the defendant in exchange for using the defendant's residence to see customers.  (Tr. 194-95)  The defendant proceeded to post advertisements of Victim-2 on Backpage.com.  (*See, e.g.*, GX 368-70; Tr. 190-91.)  In one advertisement, for example, the

defendant posted that Victim-2 was "NEW," "willing and able," and available for "prego fetishes" because Victim-2 was "with child." The advertisement included Victim-2 in sexually explicit poses, including a pose in which Victim-2 showed that she was pregnant. (*See* GX 370.) Victim-2 lived at the Midwood Residence with Victim-1 and the defendant on and off for several months, traveling back and forth between her foster care placement and the defendant's home. (Tr. 188-189.) While at the defendant's home, Victim-2 had sex with customers, including by seeing customers with Victim-1, which earned them more money for the defendant. (Tr. 192-93.) Victim-2 provided a portion of the proceeds that she made to the defendant. (Tr. 194-95.)

During a period when Victim-2 was not living at the Midwood Residence, the defendant told Victim-1 that he "wanted another girl to come to help make more money" and directed Victim-1 "to see if [she] had any friends that wanted to make some money." (Tr. 196-197.) At the defendant's direction, Victim-1 communicated by phone with Victim-3, who Victim-1 also knew from the social services system, to try and persuade her to come to the defendant's house. (Tr. 198, 544.) Victim-3 arrived at the Midwood Residence around the time of her seventeenth birthday, September 3, 2016. (GX 403; Tr 198, 539-40.) The defendant provided Victim-3 and Victim-1 with marijuana and liquor. (Tr. 545-46.) He then told Victim-3 to "take off [her] clothes and take photos . . . in his bedroom." (Tr. 547-548.) He instructed Victim-3 to "pose a certain way, to arch [her] back, to spread [her legs], to make it look sexy." (*Id.*) On September 5, 2016, two days after Victim-3 had turned seventeen years old, the defendant posted an advertisement of Victim-3 on Backpage.com. (GX 367; Tr. 200, 548.) He featured that she was "new in town to enjoy [her] birthday" and noted that she was "young and ready," "nice and tight," and would engage in "fetishes." (*Id.*) That advertisement included photographs of Victim-3 in her underwear and posing in sexually explicit positions on the defendant's bed. (Tr. 199-200.) Victim-3 was not

allowed to keep any of her earnings from commercial sex acts and was required to provide all of them to Victim-1, who in turn handed them over to the defendant. (Tr. 203, 554-55.)

The defendant instructed the Victims to meet customers at the Midwood Residence as well as a nearby abandoned house, located a short distance away on Maple Street (the "Maple Residence"). (Tr. 180.) The Maple Residence had no electricity, no hot water, no heat, and was furnished with only a single couch that was used for prostitution. (Tr. 181-82, 552-53.) The defendant preferred that the Victims meet customers at the Maple Residence to prevent the Midwood Residence from becoming too "hot," drawing the attention of neighbors and potentially of law enforcement. (GX 202B, Tr. 424.) The defendant supplied the Victims with condoms and told them to use a particular messaging application to speak with customers. (*See* Tr. 184, 193-94, 549, 591.) He gave the Victims marijuana and alcohol and told them that they needed to "drink and smoke in order to get into the working mode. . . . to sell [their] bod[ies]." (Tr. 555.) The defendant set the prices for commercial sex depending on how long the customers would have sex with the Victims—$80 for a "short stay"; $120 for a half an hour; $160 for an hour. (Tr. 185, 551.) The Victims worked day and night, seeing as many as ten to fifteen customers a day. (Tr. 185, 554.) The defendant also instructed his half-brother, Hensley Dupigny, to provide phones for the Victims to use to receive phone calls from customers. (Tr. 394-95.)

The defendant periodically used force and threats of force with Victim-1 and Victim-3 to maintain control over them. The defendant was violent with Victim-1 if she "took too long on a date." (Tr. 205.) If the customer stayed "overtime" and did not pay "extra money for the extra time," the defendant would "smack" and "choke" Victim-1. (Tr. 205-206.) On one occasion, the defendant smacked Victim-1 so hard that she got a blood clot in her eye. (Tr. 206.) Victim-1 further observed firearms in the defendant's home, including handguns and larger firearms. (Tr.

206-207.)  The defendant also was violent with Victim-3 "almost every day."  (Tr. 555-556.)
When Victim-3 was sleeping and a customer was available, the defendant would wake Victim-3
and, if she did not want to see the customer, he would "drag [her] out of the bed."  (*Id.*)  On one
occasion, when she did not want to get up, he pulled out a firearm and told Victim-3 "to get out of
the bed and work."  (Tr. 56-557.)  On another occasion, the defendant, armed with a gun, "dragged"
Victim-3 out of the shower to see a client.  (*Id.*)

In December 2016, Victim-1 and the defendant were arrested together in a shoplifting
incident in Nassau County, Long Island.  The defendant instructed Victim-1 not to provide law
enforcement with her true name and fingerprints.  (Tr. 210.)  The defendant remained detained,
and Victim-1 was released shortly thereafter.  While he was incarcerated, the defendant initially
told Victim-1 not to engage prostitution, so that he could be the first person to have sex with her
when he was released, but eventually determined that he needed money and enlisted his friends
and families to continue the Victims' trafficking during his detention.  (Tr. 211, 235.)

The defendant first directed his co-defendants—Dariel Braham and Christopher Bullock—
to watch over Victim-1 and Victim-3 as they continued to engage in prostitution for the defendant's
benefit as well as coordinate transferring the money that they made to the defendant.  (Tr. 227-28,
276-77.)  In particular, the defendant directed Braham to serve as a bodyguard and watch over the
victims while they were engaging in sex acts.  (GX 203A-T (Hubert Dupigny: "I don't want them
to do their thing when nobody ain't there type shit. Know what I mean? I need you to hold it down,
bro."); Tr. 224-25.)  He confirmed with Braham the number of customers and amount of money
that they were making.  (GX 203A-T (Braham: "She said that they make only 150, 160. . . . Then
she told me that she had like 3 or 4 customers."); Tr. 225-26.)  The defendant also had the victims
report their earnings to him, despite knowing that they should not be discussing that topic on a

recorded phone call while he was in prison.  (GX 203B-T (Victim-1: "Yo we end up fucking, got like what 160?" Hubert: "That's what I heard. So I heard, I heard." Victim-1 "Mhm." Hubert: "We ain't gotta talk about no prices or nothing man on the phone.").)  On February 26, 2017, the defendant informed Victim-1 that she needed to talk to "Juice"—Christopher Bullock—about having Victim-3 engage in commercial sex acts. (GX 226A-T.)  In particular, Victim-1 said they were having problems "posting-up"—*i.e.*, putting advertisements for sex acts on Backpage.com— and the defendant responded that he "know[s] how to do it" and "how to deal with it," unlike "Juice." (*See id.*).  When the defendant grew worried that the commercial sex activities at the Midwood Residence were going to attract law enforcement attention in his absence, he began looking for another location where Victim-1 and Victim-3 could meet customers.

On February 28, 2017, the defendant and Hensley Dupigny had the following recorded phone conversation while the defendant was still incarcerated:

HUBERT DUPIGNY: […] But you got a spot though?

HENSLEY DUPIGNY: Yeah I got two spots.

HUBERT DUPIGNY: - So yo I got my shorty's, man. I got my shorty's, I need help with that my nigga. If you got a spot –

HENSLEY DUPIGNY: Talk to Juice and let me know son.

HUBERT DUPIGNY: But if you gotta spot my nigga, then let me know, so I can have my shorty's work with you type shit, man.

HENSLEY DUPIGNY: Yo it's already there my nigga.

HUBERT DUPIGNY: But don't kill them, my nigga. At the same time, they helping me with my shit.

HENSLEY DUPIGNY: Yeah, I know.

HUBERT DUPIGNY: They helping me with my bills and my fucking account over here. I'm trying to put money aside so that when I come home, my bills are fucking paid or whatever the case may be. You know what I'm saying? […]

In the context of the call, Hensley Dupigny describes having "spots," or locations that Hensley is using for prostitution. The defendant asks Hensley to pimp out some of his "shorty's"—referring to Victim-1 and Victim-3—provided that Hensley still allows the girls to contribute part of the money earned to the defendant (*i.e.*, "But don't kill them"; "They helping me with my bills"). In other words, the defendant, with the assistance of Hensley Dupigny, continued to manage and profit from the Victim-1 and Victim-3's prostitution activities, despite his incarceration. (GX 202B-T.) The defendant also had Hensley Dupigny check in on his victims to confirm their whereabouts (GX 205-T), whether they were working (GX 206-T), and expressed frustration with Hensley Dupigny when he learned that they were not making him money, (GX 206-T (Hubert Dupigny: "They're supposed to be on it. What the f*ck she doing, playing games?")).

In subsequent recorded phone conversations, the defendant told Victim-1 that he had spoken with Hensley Dupigny who had a "spot" that they could use for commercial sex. (GX 203C-T; Tr. 229-33.) On February 28, 2017, for example, the defendant instructed Victim-1 to "holla at [Hensley Dupigny] and use his spot," but that the defendant did not want Hensley Dupigny to get paid anything because the victims were "helping [the defendant] with [his] account" and the profits should be directed to the defendant. (*See id.*) The defendant also encouraged Victim-1 to perform out-calls, instead of just having customers come to her, in order to make more money and admonished her when she did not request money from a customer before engaging in sex acts. (GX 225C-T; Tr. 283-84.) He also spoke with Victim-3 while incarcerated and told her not to "bite the hand that feeds you." (GX 209A-T; Tr. 561-62.) After engaging in commercial sex acts for him, Victim-1 and Victim-3 provided him with clothing, put money in his commissary account, and gave money to his mother. (*See, e.g.*, GX 209B-T, 225A-T, 228B-T, 237A-T; Tr. 212-15, 222-23.) Victim-1, who was broke, told the defendant that "the money that

was coming in, that was going to your books. . . . All this money that I've been having, it's goin'

toward your books." (GX 223A-T.)  Victim-1 and Victim-3 eventually stopped working for the

defendant in 2017 while he was still incarcerated.  (Tr. 287, 562-63.)

## II.   The Presentence Investigation Report and The Defendant's Objections

On June 15, 2021, the Probation Office issued its pre-sentence investigation report

("PSR").  The PSR calculates that the defendant's total offense level is 39.  (PSR ¶ 64.)  In

particular, the PSR states that there are three groupings, one for each of the Victims, and that each

of those groupings has a base offense level of 30, a two-point enhancement pursuant to Section

2G1.3(b)(2)(B) (unduly influencing the victim to engage in prohibited sexual conduct), a two-

point enhancement pursuant to Section 2G1.3(b)(3)(A) (the offense involved use of a computer to

persuade, induce, entice, coerce, or facilitate the travel of the victim to engage in prohibited sexual

conduct), and a two-point enhancement pursuant to Section 2G1.3(b)(4)(A) (the offense involved

the commission of a sexual act or sexual contact).  Pursuant to Section 3D1.4, the PSR then applied

three units, one for each of the groups, to the highest adjusted offense level (which is 36 for each

of the groups), resulting in a combined adjusted offense level of 39.  (Id. ¶¶ 34-64.)  The PSR

further determined that the defendant had nine criminal history points, based on seven points

awarded for prior convictions and two points for having committed a portion of the instant offense

while incarcerated, pursuant to Section 4A1.1(d), resulting in an applicable Guidelines range of

360 months to life imprisonment.  (Id. ¶¶ 66-75, 95.)

The Probation Office recommends 360 months' imprisonment on Count One and

concurrent sentences of 120 months' imprisonment on Counts Two and Four.  (Id. at p. 23).  The

Probation Office summarizes the defendant's trafficking of the Victims, including his use of force

in doing so, and concludes that "given the nature of the offense and the defendant's role, [a

sentence of 360 months' imprisonment] serves the sentencing factors of deterrence, just punishment, respect for the law, and protection of the community." (*Id.*)

The defendant has raised several objections to the PSR in his sentencing submission. In particular, the defendant argues that: (1) Victim-2 should not be accounted for in determining the defendant's offense level (*see* Def. Sentencing Mem., dated June 10, 2021, Dkt. no. 363 ("Def. Mem.") at 8-9; *see also* PSR ¶¶ 42-49, 58); (2) a two-level enhancement pursuant to Section 2G1.3(b)(3)(A) of the Guidelines (that the offenses at issue involved use of a computer to "persuade, induce, entice, coerce or facilitate the travel of, the minor to engage in prohibited sexual conduct") should not apply (*see* Def. Mem. at 9-10; *see also* PSR ¶¶ 36, 44, 52 ); and (3) the two-level enhancements pursuant to Sections 2G1.3(b)(2)(B) (for unduly influencing the victims to engage in prohibited sexual conduct) and 2G1.3(b)(4)(B) (because the offenses involved the commission of a sexual act or sexual conduct) should not both apply because doing so would constitute "impermissible double counting," (*see* Def. Mem. at 10 ; *see also* PSR ¶¶ 35, 37, 43, 45, 51, 53). The defendant further asserts that his criminal history score is "overstated" and that he should be in Criminal History category II. (*See* Def. Mem. at 10.)

The Government submits that, based on the trial record, the Court should make a finding at sentencing that such enhancements are applicable, the defendant is in Criminal History Category IV, and the relevant Guidelines range is therefore 360 months to life imprisonment.

### 1. Victim-2 Should Be Accounted for in the Defendant's Offense Level

*First*, the defendant argues that the Court should not include Victim-2 in its calculation of the defendant's applicable Guidelines range because the defendant was acquitted of Count Three at trial and there is purportedly insufficient evidence in the trial record for the Court to find that the defendant trafficked Victim-2. (Def. Mem. at 8-9.) The record, however, amply demonstrates

that the defendant advertised, harbored, and maintained Victim-2 while she engaged in commercial sex acts and that the defendant took portions of her proceeds from those activities: Victim-1 and Hensley Dupigny both testified that Victim-2 worked as a prostitute for the defendant; the Government introduced advertisements, which featured Victim-2 and were posted by the defendant; and the Government also introduced recorded calls in which the defendant discussed with Victim-1 that Victim-2 wanted to work in prostitution with them *again*. The Court, therefore, should reject this argument and include Victim-2 in determining the defendant's offense level.

A "jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *United States v. Watts*, 519 U.S. 148, 157 (1997). That includes where, as here, such a finding would affect the sentencing court's Guidelines calculation as long as the resulting sentence does not "exceed a the statutory maximum authorized by the jury verdict" or impose "a mandatory minimum sentence . . . not authorized by the verdict." *United States v. Vaughn*, 430 F.3d 518, 527 (2d. Cir 2005) (concluding that even acquitted conduct can be used to calculate Guidelines sentencing range if proved by preponderance); *United States v. Rodriguez–Gonzalez*, 899 F.2d 177, 181–82 (2d Cir. 1990) (concluding that Guidelines enhancement pursuant to § 2D1.1(b)(1) could be applied to a defendant acquitted of violating 18 U.S.C. § 924(c)); *accord United States v. Lynch*, 92 F.3d 62, 67 (2d Cir. 1996). In determining the appropriate sentence, the "sentencing court may rely upon any information available to it," *United States v. Shepardson*, 196 F.3d 306, 309 (2d Cir. 1999), and may base its factfinding "on circumstantial evidence and on reasonable inferences drawn therefrom," *United States v. Gaskin*, 364 F.3d 438, 464 (2d Cir. 2004).

In this case, there is ample evidence in the record for the Court to find that the defendant trafficked Victim-2. Victim-1 testified that, after she moved in with the defendant, she discussed with Victim-2 that they could work together to "make some money" by engaging in prostitution for the defendant. (Tr. 188-90.) Victim-2 then stayed at the Midwood Residence, traveling back and forth between the defendant's home and Victim-2's foster care placement in the Bronx for several months, including in October 2016. (Tr. 187-188, 190, 193.) During that period, Victim-2 saw clients, including at the 50 Maple Street location that the defendant provided. (Tr. 192.) Victim-1 also engaged in commercial sex acts *with* Victim-2 to make "more money" for the defendant. (*Id.*) Victim-1 testified about a particular instance when she and Victim-2 had sex with a client at the defendant's home and, after the customer stated that he had lost his wallet, the defendant and Braham pulled out a firearm on the customer to intimidate him. (Tr. 207-208.) Victim-1 also observed Victim-2 provide the defendant with a portion of the money that Victim-2 made from seeing customers. (Tr. 194-195.) Victim-1's testimony on this point was highly credible, particularly given her first-hand interactions and experiences that formed the basis for her knowledge of Victim-2's sex trafficking activities. This evidence, alone, would be enough for the Court to make its finding.

Hensley Dupigny also testified at trial that it was his understanding that Victim-2 was engaging in prostitution for the defendant. Hensley Dupigny testified, among other things, that he met Victim-1 and Victim-2 at the defendant's home in or about 2016, (Tr. 396), and that he understood that both Victim-1 and Victim-2 were "working during that time" in "prostitution," (Tr. 398). In particular, Hensley Dupigny discussed with Victim-1 and Victim-2 that the house was "comfortable for them to end up in [engaging in prostitution]," that they "would need a phone" for those activities, and discussed that Backpage was a means for advertising commercial sex acts.

(Tr. 398-99.) Hensley Dupigny understood, at the time, that because Victim-1 and Victim-2 "were [engaging in prostitution] at the [defendant's] house . . . they were working with [the defendant]." (Tr. 398) Hensley Dupigny also subsequently went to 50 Maple Street with the defendant, to survey it as a potential location for a prostitute working for Hensley Dupigny, and believed that Victim-1 and Victim-2 were working for the defendant at that time as well. (Tr. 409, 412).

Victim-1's and Hensley Dupigny's testimony was further corroborated by additional evidence introduced at trial, including advertisements of Victim-2 which were posted by the defendant and recorded phone conversations in which the defendant discussed Victim-2. In particular, on or about May 4, 2017, the defendant spoke with Victim-1 while the defendant was incarcerated. Victim-1 informed the defendant that Victim-2 wanted to "f*ck with [them] *again*," which Victim-1 testified at trial meant that Victim-2 wanted to again engage in prostitution for the defendant. (GX 228A (emphasis added); Tr. 273-74.) Victim-1 further identified certain advertisements, posted by a Backpage account associated with the defendant's email address, that contained photographs of Victim-2 in or around the time when Victim-2 was engaging in prostitution for the defendant. (Tr. 190-92, 543, 599-600; GX 368, 369, 370.)[3]

Accordingly, based on the trial record, there is more than sufficient evidence for the Court to find by a preponderance that the defendant trafficked Victim-2, including by harboring her at his home while she engaged in prostitution, providing her with locations to meet with customers, advertising her on Backpage for commercial sex acts, and taking a portion of her profits from those activities. Any one of those actions would satisfy a finding that the defendant trafficked Victim-2 and that he should be held accountable for his conduct in the Court's calculation of the Guidelines.

---

[3] The Government also introduced evidence at trial that Victim-2 was a minor during the relevant time period. (*See* GX 402; Tr. 332-33.)

## 2.   The Enhancement Pursuant to Section 2G1.3(b)(3) of the Guidelines Applies

*Second*, the defendant argues that an enhancement pursuant to Section 2G1.3(b)(3)(A) of the Guidelines does not apply in this case.  (*See* Def Mem. at 9-10.)  That section states that a two-level enhancement is appropriate where:

> The offense involved the use of a computer or an interactive computer service to (A) persuade, induce, entice, coerce, or facilitate the travel of, the minor to engage in prohibited sexual conduct or (B) entice, encourage, offer, or solicit a person to engage in prohibited sexual conduct with the minor.

U.S.S.G. § 2G1.3(b)(3)(A).  The defendant asserts that "the record is unequivocal that . . . [the defendant] met [Victim-1] at a bus stop, and she first broached the topic of engaging in prostitution with him," (*see* Def. Mem. at 9 (citing Tr. 71, 147)), and that the "record is likewise inadequate as to [Victim-3], and silent as to [Victim-2]" regarding use of a computer device in enticing or persuading the victims to travel to engage in prohibited sexual conduct, (*id.* (citing Tr. 544)).

The defendant's arguments regarding Victim-1 are flatly contradicted by the trial record.  When the defendant and Victim-1 first met, the defendant was "flirtatious" with Victim-1 and exchanged phone numbers with her.  (Tr. 72, 146.)  The defendant then spoke with Victim-1 on the phone, during which Victim-1 told the defendant that she "needed some way to make some money."  (Tr. 147.)  The defendant responded that he was not a "trick"—a customer—but that he could "help [Victim-1] make some money" by having her engage in prostitution.  (Tr. 147-148.)  The defendant then communicated with Victim-1 by text message to persuade Victim-1 to work for him, informing Victim-1 that he had "3 tricks"—or customers for commercial sex services—who he had "lined up" and were waiting for her.  (GX 704; Tr. 150-51.)

Victim-1 continued discussing with the defendant the possibility of working for him by trading sex for money and sent him photographs that he needed for advertisements that he would post for commercial sex services.  (GX 704, 109, 110; Tr. 153-55.)  After the defendant promised

16

her a place to live because she was homeless at the time, she went to his home in Brooklyn and began living with him and, ultimately, engaging in prostitution for him.  Further, after the defendant was incarcerated, he had recorded phone conversations with Victim-1 in which he attempted to persuade her to restart her commercial sex acts, including by engaging in "out calls," where Victim-1 would travel to customers.[4]  (GX 225C-T; Tr. 283-84, 316.)  The defendant, therefore, repeatedly used a cellphone to entice and persuade Victim-1 to engage in commercial sex acts.

Similarly, with respect to Victim-3, the defendant told Victim-1 that he "wanted another girl to come to help make more money" and directed Victim-1 "to see if [she] had any friends that wanted to make some money." (Tr. 196-97.)  At the defendant's direction, Victim-1 called Victim-3 to try and persuade her to come to the defendant's house. (Tr. 198.)  Although the defendant did not personally speak with Victim-1 over the phone, Victim-1 was operating at the defendant's direction in attempting to persuade Victim-3 to engage in sex acts.  The applicable subsection only states that the offense "involved" a computer for certain specified purposes, not that the defendant himself must have used the device.  The defendant's conduct, therefore, falls within the plain terms of this Guidelines section—cellphones were used to recruit and entice Victim-1 and Victim-3 to engage in prostitution—and the enhancement should apply.[5]

---

[4] The defendant need not have persuaded the victims *to travel* in order to engage in commercial sex acts to qualify for this enhancement. *See United States v. Watkins*, 667 F.3d 254, 262 (2d Cir. 2012) ("[T]he plain language of the sentence indicates that the phrase 'facilitate the travel of' is meant to be read separately from the terms 'persuade,' 'induce,' 'entice,' and 'coerce,' as each term is set off by a comma.")

[5] If the Court found that this enhancement applied to the defendant's conduct regarding Victim-1, but not to Victim-2 or Victim-3, the defendant's total offense level would not change.  That is because, as described above, the greatest of the adjusted offense levels for the three groups is used to calculate the defendant's total offense level. *See* PSR ¶ 41.

Even if the Court were to find that subsection (A) of Section 2G1.3(b)(3) does not apply to some or all of the Victims, subsection (B) plainly would. Among other things, the defendant posted advertisements of all the Victims on Backpage.com (*see, e.g.*, GX 336, 367, 370), provided the Victims with cellphones to speak with customers (*see* Tr. 234, 398-399, 393-394, 451), and directed customers to call their phones if the customers were interested in engaging in commercial sex acts with the Victims, (*see, e.g.*, Tr. 171-172, 200-202). In particular, while the Victims worked for the defendant, he directed them to use a specific phone application that allowed customers to call and text them for free. (Tr. 193-194.) *See United States v. Cramer*, 777 F.3d 597, 604 (2d Cir. 2015) (noting defendant "does not dispute that he posted ads online to solicit third parties to engage in prohibited sexual conduct with [the victims]. Based on the text of the Guidelines alone, the third-party solicitation enhancement clearly applies to [the defendant's] conduct.") This enhancement therefore plainly applies to all the Victims.

### 3. The Enhancements Pursuant to Sections 2G1.3(b)(2)(B) and 2G1.3(b)(4)(B) of the Guidelines Are Not Impermissibly Duplicative

*Third*, the defendant asserts that two enhancements under the Guidelines are impermissibly duplicative: (1) Section 2G1.3(b)(2)(B) (defendant unduly influenced victim to engage in prohibited sexual conduct) and (2) Section 2G1.3(b)(4)(A) (the offense involved the commission of a sexual act or sexual contact).[6] (*See* Def. Mem. at 10.) The Court should reject that argument.

"Impermissible double counting occurs when one part of the [G]uidelines is applied to increase a defendant's sentence to reflect the kind of harm that has already been fully accounted for by another part of the [G]uidelines." *United States v. Volpe,* 224 F.3d 72, 76 (2d Cir. 2000). However, when the challenged part of the Guidelines "aim[s] at different harms emanating from

---

[6] The defendant does not dispute that *either* enhancement could apply in this case, only that *both* enhancements should not apply.

the same conduct," there is no impermissible double counting. *Id.* Therefore, "enhancements are not duplicative when they reflect different facets of the defendant's conduct." *United States v. Sabhnani,* 599 F.3d 215, 251 (2d Cir. 2010) (internal quotation marks omitted).

Here, there is no impermissible double-counting. The two relevant sections of the Guidelines are aimed at accounting for different harms: Section 2G1.3(b)(2)(B) applies a two-level enhancement if a defendant "unduly influences" a victim and Section 2G1.3(b)(4)(A) applies a two-level enhancement if a sexual act or sexual contact is committed. Application Note 3(B) states that, "[i]n determining whether subsection (b)(2)(B) applies, the court should closely consider the facts of the case to determine whether a participant's influence over the minor compromised the voluntariness of the minor's behavior. The voluntariness of the minor's behavior may be compromised *without prohibited sexual conduct occurring.*" (*Id.* (emphasis added).) Therefore, Section 2G1.3(b)(2)(B) may be applied even when a sexual act or sexual contact does not occur and is, instead, aimed at accounting for a different form of conduct—the defendant's role in influencing the victim to engage in potential (or realized) prohibited sexual conduct.

In *United States v. Watkins*, the Second Circuit considered a closely related question. There, the defendant was convicted of violating 18 U.S.C. § 2423(a), which prohibits the knowing transportation of "an individual who has not attained the age of 18 years in interstate or foreign commerce, or in any commonwealth, territory or possession of the United States, *with intent that* the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense." 18 U.S.C. § 2423(a) (2006) (emphasis supplied); *see United States v. Watkins*, 667 F.3d 254, 261–62 (2d Cir. 2012). The Second Circuit held that the district court did not err in applying an enhancement under § 2G1.3(b)(4)(A), which directs that the base offense level be increased by two levels if "the offense involved the commission of a sex act or sexual

contact." U.S.S.G. § 2G1.3(b)(4)(A); *see Watkins*, 667 F.3d at 262. In doing so, the Second Circuit noted that "[o]ne may commit [a violation of section 2423(a)] without actually having committed a sex act. Therefore, given that [the defendant] transported a minor in violation of 18 U.S.C. § 2423(a), and the overwhelming and undisputed evidence demonstrates that he committed a sex act with Doe, a minor, the District Court's application of the § 2G1.3(b)(4)(A) enhancement is not error, let alone clear error." *Watkins*, 667 F.3d at 261–62 (affirming, on other grounds, sentence where enhancements pursuant to Sections 2G1.3(b)(2)(B) and 2G1.3(b)(4)(A) were both applied); *United States v. Adams*, No. 14 Cr. 0650, 2017 WL 3503674, at *2 (E.D.N.Y. Aug. 14, 2017), *aff'd*, 749 F. App'x 25 (2d Cir. 2018) (same).

Similarly, as described above, the application of Section 2G1.3(b)(2)(B) does not require the actual commission of a sex act and instead focuses on the degree to which the defendant influenced the victim. *See* U.S.S.G. § 2G1.3(b)(2)(B), Application Note 3(B) (noting enhancement may apply "without prohibited sexual conduct occurring"). Accordingly, because the enhancements are not targeted at the same type of conduct, it would not be impermissibly duplicative to apply both in calculating the appropriate offense level.

### 4. The Enhancement for Obstructing Justice Applies

*Fourth*, although the defendant does not raise it in his submission, the Government respectfully submits that the obstruction of justice enhancement pursuant to Section 3C1.1 also applies.[7]   That section states that the offense level should be increased by two levels:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense.

---

[7] The Probation Office "defers to the Court" on whether this enhancement applies.  (PSR ¶ 56).

U.S.S.G. § 3C1.1.   That section further specifies that an enhancement is appropriate when a defendant "commit[s], suborn[s], or attempt[s] to suborn perjury." *See* U.S.S.G. § 3C1.1, Application Note 4.   Where, as here, a defendant perjures himself and attempts to obstruct proceedings, "[i]t is rational for a sentencing authority to conclude that a defendant . . . [is] attempt[ing] to avoid responsibility" and therefore is "more threatening to society and less deserving of leniency than a defendant who does not so defy the trial process."   *United States v. Dunnigan*, 507 U.S. 87, 97 (1993).   That is because "[t]he perjuring defendant's willingness to frustrate judicial proceedings to avoid criminal liability suggests that the need for incapacitation and retribution is heightened as compared with the defendant charged with the same crime who allows judicial proceedings to progress without resorting to perjury." *See id.* at 98.

Here, those same considerations apply.   At trial, the defendant committed perjury.   He testified that he never trafficked Victim-1 or Victim-3, and that he never conspired to sex traffic any of the Victims.   (Tr. 660-661.)   The defendant was convicted of those offenses and the jury could not have credited his testimony in concluding that he was guilty.   In doing so, the defendant has not only failed to accept responsibility for his conduct, he has also shown an incapacity for abiding by and following court orders.   An obstruction of justice enhancement, therefore, would be appropriate in this case.

### 5.   The Defendant's Criminal History Category is Not Overstated

Finally, the defendant contends that the PSR's determination that he is in Criminal History Category III is "overstated" and that he, instead, should be placed in Criminal History Category II.   (Def. Mem. at 10.)   The defendant does not provide any support for his argument aside from the fact that his prior sentences did not exceed more than one year and several of his convictions occurred more than ten years ago.   The Court should not depart from the Guidelines' analysis and

adopt the defendant's approach of calculating his criminal history. The Guidelines expressly provide that convictions for which the defendant is sentenced to less than 13 months and which occurred more than ten years from the time of the offense receive fewer (or no) criminal history points. *See* U.S.S.G. §§ 4A1.1(a)-(c); 4A1.1(e). There is no basis for the Court to additionally discount the defendant's criminal history: as discussed below, the defendant committed serious crimes, including unlawful imprisonment and acting in a manner to injure a child less than seventeen years old. (*See* PSR ¶ 71.) The Court, therefore, should reject the defendant's argument that he should be in Criminal History Category II.

## DISCUSSION

The defendant was a 33-year old man who recruited minors to have sex for money. He preyed on an incredibly vulnerable population—young girls who were runaways from the foster care system and did not have homes or family members to whom they could turn. He exploited those vulnerabilities to make himself money. His conduct has forever altered those victims' lives. Yet, the defendant argues that a sentence of 120 months' imprisonment—the mandatory minimum sentence and a fraction of the bottom of the applicable Guidelines range—is fair and appropriate in this case. The defendant requests this dramatic downward variance for his crimes based on his personal background, the conditions of his pre-trial confinement, and the circumstances of his instant offense. For the reasons that follow, the defendant's arguments do not merit the leniency he now seeks, and the Court should impose a sentence within the applicable Guidelines range.

## I.    A Guidelines Sentence Is Appropriate

As the Probation Office determined in its pre-sentence report, a Guidelines sentence is appropriate in this case in light of the Section 3553(a) factors, including the nature and seriousness

of the defendant's crime, the need to avoid unwarranted sentencing disparities with the defendant's co-conspirators, and the need for general and specific deterrence. (*See* PSR at p. 20.)

### A.     The Nature and Seriousness of the Defendant's Crime

The nature, circumstances, and seriousness of the defendant's crime cannot be overstated. *See* 18 U.S.C. § 3553(a)(1), (a)(2)(A). As this Court has noted in the sentencings of co-defendants, the conduct at issue in this case is "atrocious." (*See* Bullock Sentencing Tr., Dkt. no. 245, at 20.). The sexual exploitation of children is among the most serious of offenses. The defendant victimized, and violently abused, some of the most vulnerable members of our society for his own financial gain. And the defendant was keenly aware of the Victims' vulnerabilities. The Victims told him their ages (Tr. 205 (Victim-1); Tr. 546 (Victim-3)) and that they were coming from foster care placements (Tr. 546 (Victim-3)). He discussed their youthful appearances in conversations with his co-defendants. (*See* GX 229-T (Hubert Dupigny: "[Victim-1 is] growing into her appeals"); GX 228-T (Hubert Dupigny: "I was thinking about [Victim-2] the other day, too, and her little piglets.")). In certain instances, he even used their youth as an attraction, a selling point for customers. (GX 367 (featuring Victim-3 as "young and ready").) He understood that they needed a place to stay and a way to make money: Victim-1 explained to him, before coming to the Midwood Residence, that she "had nowhere to reside," that she was "homeless," and that she "needed some way to make some money." (Tr. at 147-148.) The defendant capitalized on those vulnerabilities to make money for himself. He saw an opportunity and he took it, regardless of the cost to the victims.

Indeed, the defendant's primary goal was to make more money: he had the Victims see dozens and dozens of strangers for sex each week, he had Victim-1 and Victim-2 meet with customers together to increase their profits. He directed the Victims to engage in prostitution in

abysmal conditions—using a single couch in an abandoned home without electricity, heat, or running water. And Victim-1 and Victim-3 were not allowed to keep the money that they earned, relying on the defendant to provide them with food and clothing. When Victim-1 and Victim-3 disobeyed him, whether by not getting enough money for their sex acts or refusing to see customers, the defendant used force—he punched and choked them, he gave Victim-1 a blood clot in her eye, and he pulled out a gun on Victim-3. To say that these crimes are serious does not come close to capturing the pain and suffering that the defendant has caused for these minor victims.

The defendant's crime also is particularly serious because he committed at least a portion of that offense while he was incarcerated. Even while incapacitated in prison, he continued to engage in illegal conduct and the exploitation of his victims. He also organized other individuals—his friends and family—to help him continue to make money while he was in prison. The defendant was not a passive player in this scheme; he was an active leader. He engaged in the offense conduct without regard for the consequences that his co-conspirators would face and with the purely selfish intent to make money while he was in prison.

The defendant ruined the lives of multiple young girls. He found vulnerable minors, brought them under his control, and used violence and manipulation to maximize his personal financial gain. The applicable Guidelines Range of 360 months to life imprisonment is an incredibly serious term of imprisonment, but that range of imprisonment appropriately reflects the seriousness of the defendant's crime.

### B.  The Need to Avoid Unwarranted Sentencing Disparities

The need to avoid unwarranted sentencing disparities also supports the imposition of a Guidelines sentence. *See* 18 U.S.C. § 3553(a)(6). A Guidelines sentence here would present

disparities neither with respect to the defendant's co-conspirators or those charged in related cases, nor more generally with respect to sex trafficking defendants.

As the Court is aware, the co-defendants in this case have been sentenced to lower terms of imprisonment than what the defendant now faces. Those co-defendants, however, are not similarly situated to this defendant. Defendants Dariel Braham, Christopher Bullock, and Adrienne Roberts were pawns in the defendant's scheme, individuals who the defendant recruited to help him continue to make money while he was imprisoned and incapacitated.[8] Their involvement was far less significant—they did not recruit the victims or post advertisements of them—and lasted for less time than the defendant. Those co-defendants received plea offers commensurate with their conduct that did not include mandatory minimums and much lower applicable Guidelines ranges. All of those defendants accepted responsibility and pled guilty pursuant to those plea agreements. Further, co-defendant Hensley Dupigny cooperated in this case and received a letter at sentencing from the Government pursuant to U.S.S.G. § 5K1.1.[9] The defendant is not similarly situated to any of his co-defendants and should receive a significantly higher sentence.

The applicable Guidelines range also is commensurate with the defendant's culpability relative to defendants in other cases arising from the same investigation. As noted in the PSR, the investigation that led to this prosecution began when the FBI's Child Exploitation and Human Trafficking Force received a tip from a non-profit organization about trafficking of minor victims—many of whom were residing, or had previously resided, at Facility-1. (PSR ¶ 15).

---

[8] Christopher Bullock received a sentence of 54 months' imprisonment, Dariel Braham received a sentence of 48 months, and Adrienne Roberts received a sentence of 48 months. (PSR ¶¶ 9-11.)

[9] Hensley Dupigny received a sentence of 48 months' imprisonment. (PSR ¶ 8.)

Ultimately, the investigation has led to the prosecution of 19 individuals for sex trafficking offenses, each of whom has been convicted either by entering into a plea agreement or following trial.  In general, the Government extended plea agreements to sex trafficking offenses to those, like the defendant, whom it viewed as most culpable.  The following defendants who were part of that case and have been convicted of sex trafficking offenses—*i.e.*, violations of Title 18, United States Code, Sections 1591 or 1594(c)—have been sentenced as follows:

- Ruben Morciglio, sentenced to 240 months' imprisonment after pleading guilty to one count of sex trafficking a minor, in violation of Title 18, United States Code, Section 1591(b)(2), and two counts of sex trafficking conspiracy, in violation of Title 18, United States Code, Section 1594(c), in *United States v. Morciglio*, 18 Cr. 873 (VSB);

- Luidji Benjamin, sentenced to 204 months' imprisonment after being convicted at trial of one count of sex trafficking of a minor, in violation of Title 18, United States Code, Section 1591(b)(2), and one count of sex trafficking conspiracy, in violation of Title 18, United States Code, Section 1594(c), in *United States v. Benjamin*, 18 Cr. 874 (JSR);

- Jabari Kennedy, sentenced to 156 months' imprisonment after pleading guilty to a single count of sex trafficking conspiracy, in violation of Title 18, United States Code, Section 1594(c), in *United States v. Jabari Kennedy, et al.*, 18 Cr. 529 (JFK);

- Jermaine Myrie, sentenced to 135 months' imprisonment after pleading guilty to a single count of sex trafficking conspiracy, in violation of Title 18, United States Code, Section 1594(c), in *United States v. Sean Merchant, et al.*, 18 Cr. 527 (KMW); and

- Lawrence Walsh, who entered into a cooperation agreement, testified as a Government witness at trial against his co-defendant, Luidji Benjamin, and received a sentence of time-served after approximately 19 months' imprisonment in *United States v. Lawrence Walsh*, 18 Cr. 874 (JSR).

With respect to the offense conduct, the most comparable defendant is Ruben Morciglio. Both Morciglio and the defendant trafficked multiple victims over an extended period and used force to control their victims.  Morciglio had some more aggravating factors in his case, in particular, his use of violence was in certain instances more severe and his victims were younger. Morciglio also had mitigating factors not present here: Morciglio himself was a victim of, and witness to, sexual and domestic violence during his childhood, he suffered head trauma as a young

child, and had a diagnostic history that includes bipolar disorder, post-traumatic stress disorder, and schizophrenia. Further, the defendant has some additional aggravating factors that were not present in Morciglio's case and which should be reflected in the calculation of his Guidelines range, including that he led and organized others to commit the instant offense and committed a portion of that offense while incarcerated.

A within-Guidelines sentence also would be appropriate in light of the sentences imposed in other comparable cases in this Circuit. The Second Circuit has routinely affirmed sentences that fall within the Guidelines in this case. *See United States v. Cramer*, 777 F.3d 597 (2d Cir. 2015) (sentenced to 360 months for violation of 18 U.S.C. § 1591); *United States v. Thompson*, 896 F.3d 155 (2d Cir. 2018) (sentenced to 360 months for his conviction which included a violation of 18 U.S.C. § 1591); *United States v. Rivera*, 758 Fed. App'x. 148 (2d Cir. 2018) (sentenced one defendant to 40 years and another defendant to 30 years for their crimes which included violations of 18 U.S.C. § 1591); *United States v. Pierre-Louis*, 2019 WL 2235886 (S.D.N.Y. 2019) (sentenced to 360 months in prison for crimes which included violations of 18 U.S.C. § 1594); *see also United States v. Flores-Mendez*, 13 Cr. 301 (KBF) (sentenced to life imprisonment, after pleading guilty, for violations of 18 U.S.C. § 1591).

The defendant cites to *United States v. Corley*, in which Corley received a sentence of 120 months' imprisonment, as a basis for imposing a below Guidelines sentence. That case is distinguished in several ways: Corley had a lower applicable Guidelines range of 210 to 262 months' imprisonment, had "never been placed in jail before," served a limited role in the offense, and did not use force with his victims. (*See United States v. Corley*, 13 Cr. 48 (AJN), Dkt. no. 66 at 23-24.) Here, the defendant not only had previous convictions, but had previous *sex offense* convictions for which he was required to register as a sex offender; he committed a portion of his

instant offense while incarcerated; his role in the offense was more significant; and he used force with his victims.

In sum, other sentences for co-defendants in this case, the broader investigation, and other cases in this District and the Second Circuit support a within-Guidelines sentence and there would be no unwarranted sentencing disparities if the Court were to impose such a sentence.

### C.     The Need for Deterrence and Just Punishment

The need for general deterrence and just punishment of individuals who traffic minor victims further supports the imposition of a Guidelines sentence. *See* 18 U.S.C. § 3553(a)(2). Minor victims continue to be trafficked out of foster care placements. A significant sentence is necessary to send a message to others who are similarly situated that they will face serious consequences if they attempt to traffic minor victims as the defendant did.

In addition, specific deterrence is paramount in this case, and a sentence within the Guidelines range is necessary to deter the defendant from engaging in criminal conduct once his sentence is completed. The defendant has demonstrated, throughout the history of this case, a reluctance to accept responsibility for his actions and a determination to openly flout the Court's authority and orders. On September 26, 2019, for example, during an ultimately aborted plea proceeding, the defendant stated that he believed the Court does not "interpret the law" and that, "I don't believe you are a judge, sir. . . . You have a duty to show me your oath of office. . . . You're an impost[er]." (Tr., dated Sept. 26, 2019, Dkt. no. 169 at 5, 46-47.) After trial, the defendant vindictively filed a lien against the Court. From the outset of the case, the defendant

has repeatedly challenged the Court's authority over him and has attempted to disrupt his proceedings.[10]

Further, the nature of the defendant's instant offense and criminal history also demonstrates a need for specific deterrence. As described earlier, the defendant committed a portion of the instant offense *while he was incarcerated*. The defendant continued to have the victims engage in sex trafficking activities even while he was in prison for another crime. And the defendant decided to engage in the offense conduct after he already had been convicted of unlawful imprisonment and acting in a manner to injure a child less than seventeen years old. Those crimes required him to register as a sex offender. (*See* PSR ¶ 71.) Yet, he still engaged in sex trafficking minor victims.

Further, the defendant's trafficking of the Victims is not an isolated incident. Victim-1 testified at trial that, when she arrived at the defendant's home, there was already a girl—("Victim-4")—living there who was engaging in prostitution for the defendant. (Tr. at 162-63.) Hensley Dupigny further testified that he and the defendant also engaged in prostituting women together before the instant offense, including as early as 2013 or 2014. (Tr. 385.) The defendant's pattern of conduct is also particularly troubling, and must be deterred in the future, because he continuously used force and firearms to assert control and intimidate others. Victim-3 testified that the defendant would drag her out of bed, was violent with her nearly every day, and showed her a firearm to make her comply; Victim-1 testified that the defendant choked and punched her, and that when she arrived at the defendant's house, the defendant had handcuffed Victim-4 to a radiator because "she was out of control"; Victim-1 further testified that she observed multiple

---

[10] The defendant has, in other unrelated proceedings, also repeatedly used different aliases and names in a seeming attempt to evade prosecution. (*See* PSR ¶¶ 67-68, 72, 78.) Similarly, and as described above, the defendant specifically counseled Victim-1 not to provide her true name after they were arrested for shoplifting because the defendant believed it would prevent her from being detained. (Tr. 210.)

firearms, including "large guns," in the defendant's home and that the defendant used a firearm to try and intimidate a customer. (Tr. 206-07.)  The defendant accessed these guns and used force to maintain control over others even after having been convicted of a serious sex offense.  He did so repeatedly, and he needs to be deterred from doing so again.

## II.   The Defendant's Arguments Do Not Merit a Non-Guidelines Sentence

The defendant argues, however, that he should be sentenced to the mandatory minimum of 120 months' imprisonment, a sentence that would represent one-third of the bottom of the applicable Guidelines range.   The defendant first argues that he deserves leniency based on his personal history and background, including that he was raised in "unrelenting poverty" and in light of his "enduring and close relationship" with his mother.  (*See* Def. Mem. at 11-12).  Next, the defendant argues that his conditions of pre-trial confinement, including the power outage at MDC and the COVID-19 pandemic, merit leniency.  (*Id.* at 12-14).   Finally, the defendant asserts that his offense falls outside of the "heartland" of conduct that Title 18, United States Code, Sections 1591 and 1594 were enacted to penalize and "lays towards the outer ambit of the dimensions of sex trafficking that Congress expressly targeted." (*Id.* at 15-16.)  For the reasons set forth below, these arguments do not merit any variance from the Guidelines.

### A.   The Defendant's Personal History and Circumstances Do Not Warrant a Below Guidelines Sentence

The defendant first argues that he was "raised in a community and home environment saturated by abuse and poverty."  (*See id.* at 11.)  The defendant, however, was raised by both parents and, as discussed below, apparently continues to at least have the support of his mother with whom he remains close.  The defendant attended high school in Prospect Heights and was able to gain lawful employment up at least until 2016, including in maintenance and by owning his own businesses. (PSR ¶¶ 89-91.)  Although the Court may, of course, take into consideration

the defendant's childhood and personal circumstances, the fact that the defendant grew up poor and did not receive much education does not justify or excuse his conduct. To the contrary, it makes all the more inexplicable his decision to capitalize off of victims who, themselves, were in dire circumstances and that he used their bodies to make himself a profit.

The defendant's close relationship with his mother similarly does not provide any basis for a below Guidelines sentence, and there is no reason to believe that the defendant would be less likely to reoffend. The defendant's relationship with his mother was the same at the time of his offense. Indeed, he directed Victim-1 to provide his mother with portions of their proceeds, and Victim-1 stayed for a period of time with his mother while the defendant was incarcerated. Further, as the record demonstrated at trial, the defendant used his other familial relationships—including his brother—to perpetuate his schemes and profit from the victims' sex trafficking. The defendant's family relationships, therefore, do not in any way merit a below Guidelines sentence.

### B. The Defendant's Pre-Trial Conditions of Confinement Do Not Support a Dramatic Downward Variance

The defendant further focuses in his submission on the conditions of his pre-trial confinement during the MDC power outage and the COVID-19 pandemic. In particular, the defendant claims that he deserves a below Guidelines sentence because he contracted COVID-19 and, more generally, argues that the measures MDC took to combat the spread of COVID-19 resulted in conditions of confinement that justify a lower sentence. While COVID-19 is undoubtedly serious, the defendant's arguments concerning the pandemic do not support his sentencing position.

The Government recognizes that the pandemic has in some circumstances made inmates' incarceration "harsher and more punitive than would otherwise have been the case … because the federal prisons … have had to impose onerous lockdowns and restrictions that have made the

31

incarceration of prisoners far harsher than normal." *United States v. Rodriguez*, No. 00 Cr. 761 (JSR), 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020) (internal quotation marks and citation omitted). The Government acknowledges the conditions that the defendant endured while incarcerated and in no way diminishes the seriousness of the defendant's experience with COVID-19. The global pandemic has imposed innumerable hardships, including lockdowns and serious restrictions on movement, on people in the United States and around the world, for individuals in detention facilities and outside of them.

The measures particular to the defendant's experience—quarantine at the MDC, for example—were undoubtedly challenging, but equally necessary to the BOP's mandate of mitigating the virus's spread and limiting the defendant's exposure to others. As the Court is aware, the BOP generally, and the MDC specifically, are actively managing the risks presented by COVID-19. Starting in January 2020, the BOP implemented an Action Plan for COVID-19.[11] The BOP continues to revise and update that Action Plan in response to the fluid nature of the COVID-19 pandemic, and in response to the latest guidance from experts at the World Health Organization ("WHO"), the Centers for Disease Control and Prevention (the "CDC"), and the Office of Personnel Management. BOP's current Action Plan, which the MDC has implemented, includes numerous measures designed to protect inmates and staff from the coronavirus pandemic.[12] Moreover, the BOP has begun administering vaccines to inmates and staff.[13] These and other steps show that the BOP is meaningfully addressing the risk posed by COVID-19 to inmates, and that it has taken the threat seriously, has mitigated it, and continues to update policies

---

[11] *See* https://www.bop.gov/coronavirus/overview.jsp#bop_covid-19_response.

[12] *See* https://www.bop.gov/coronavirus/covid19_status.jsp.

[13] *See* https://covid.cdc.gov/covid-data-tracker/#vaccinations.

and procedures in accord with the facts and recommendations, as well as directives from the Attorney General.

In support of his position, the defendant cites to *United States v. Ozols*, in which this Court gave "some acknowledgment" to a similar argument from a defendant based on conditions of confinement at MDC. (*United States v. Ozols*, 16 Cr. 292 (JMF), Dkt. no. 234 at 31). That case is distinguishable from this one in several respects. First, in *Ozols*, this Court ultimately sentenced the defendant to a 39-month term of imprisonment, only 12 months below the bottom of the 51 to 63-month Guidelines range in that case. (*See Ozols*, Dkt. no. 234 at 9, 32). Second, that departure was not solely due to the conditions of the defendant's confinement; indeed, this Court primarily acknowledged that he was "moved by [the defendant]'s obvious remorse and contrition." (*Id.* at 30). Further, the Court noted that it was the defendant's first offense, and there was not a great need for specific deterrence—a stark break from the defendant here who appears not to have accepted responsibility for his conduct. (*Id.*). Despite all of this, the ultimate sentence was still only 12 months below the bottom of the applicable Guidelines range. Thus, to the extent *Ozols* supports any leniency here, it supports a very small break from the applicable Guidelines range and not the 240 months below the applicable Guidelines range that the defendant requests.

### C. The Defendant's Offense Does Not Merit a Below Guidelines Sentence

Finally, the defendant argues that he should receive a dramatic downward variance from his applicable Guidelines range because his conduct purportedly does not fall with the "heartland" of crimes that Congress sought to penalize. (Def. Mem. at 14-24.) In particular, the defendant argues that he deserves leniency because the case (1) "does not involve the crossing of international borders and involves the most attenuated of interstate activity" (*id.* at 16); (2) the defendant "did not lure" the victims away from or know about their foster care placements when the charged

33

conduct first began and he did not "target" the victims for prostitution (*id.* at 17-18); (3) the victims already had "familiarity" with prostitution and the defendant did not "dupe" them into engaging in such activities (*id.* at 18-20); (4) the victims were not "held captive" by the defendant (*id.* at 20); and (5) the defendant did not belong to a "sophisticated, organized crime syndicate" (*id.* at 21.)  None of these arguments merit a variance, let alone the dramatic variance that the defendant requests.  To the contrary, these arguments, in many ways, are troubling because they continue to reflect the defendant's inability to fully take responsibility for his conduct and acknowledge the incredibly harmful impact that he had on the Victims.

*First,* the defendant is correct that his offense did not cross international or state boundaries.  But that does not make the harm to his victims any less traumatic or impactful.  That the defendant had the victims engage in sexual acts a few blocks from where they were living does not change the trauma that they endured when they met with strangers for sex.  And many of the same qualities that make international or interstate sex trafficking crimes particularly abhorrent were in fact present here—the Victims had no nearby family, no other place to live, and these facts made them isolated and vulnerable.

*Second*, the defendant plainly did recruit Victim-1 to come work for him.  He enticed Victim-1, who was homeless and broke, with promises that he could provide her with a place to live, help find customers for her, and make money with her.  Victim-1 explicitly told him that she was living in foster care and that she wanted to leave. And, as discussed above, the defendant told Victim-1 to find more friends to engage in prostitution for him so that they could make more money.  The defendant encouraged Victim-1 to recruit others, like Victim-3, to also engage in prostitution. The defendant knew that Victim-3 also was a runaway from foster care and that she needed a place to stay.  He exploited those vulnerabilities time and time again.

*Third*, the Government does not dispute that the Victims had previously engaged in prostitution. That is neither unusual in sex trafficking cases, nor does it excuse or justify the defendant's conduct. He helped perpetuate that downward spiral—he took young, teenage girls who were desperate for money, a home, love, and attention, and he sold their bodies for his own profit. To argue that the defendant now deserves a downward variance simply because the Victims had previously engaged in such conduct is degrading and victim-shaming. Victims who have previously been trafficked are likely to be trafficked again in a cycle that is well-illustrated in this case. The Victims' prior experiences in prostitution made them susceptible to the defendant's recruitment, and ready to go along with the defendant's objectification of them. The defendant's ability to identify their vulnerability and his readiness to commercialize it is, in fact, aggravating rather than mitigating. Significantly, the defendant himself previously had numerous other women working in prostitution for him, as Hensley Dupigny testified at trial, suggesting that he was already adept at exploiting women through prostitution. (Tr. 403-06)

*Fourth*, the defendant used both force and coercive tactics while he trafficked his victims. The defendant made clear from the beginning that he was in control: when Victim-1 first went to his home, she saw another girl who was engaged in prostitution and who was handcuffed to a radiator. The defendant violently abused Victim-1 and Victim-3; the defendant drew a firearm on Victim-3 on two occasions; and Victim-1 was locked in the Midwood Residence while she stayed there. And the defendant also employed less obvious and more subtle coercive tactics: he took all of their money so that they were reliant on him for food and clothing and he lured Victim-1 into a relationship with him. The defendant argues that the Victims were free to go wherever they wanted (Def. Mem. at 20-21), but he cites their living conditions *after* he was incarcerated and had shifted custody of their care to his brother.

35

*Fifth*, the defendant was not part of a sophisticated enterprise, but he was a leader and organizer. He recruited his friends and family members into his sex trafficking scheme while he was incarcerated. He successfully rallied those friends and family members to oversee the Victims, to ensure they continued their prostitution, and to direct the profits back to him even while in jail. Those actions, particularly the agency and leadership that they illustrate, do not deserve a downward variance.

Even now, the defendant continues to fail to take responsibility for his role in this offense. The defendant has, time and time again, failed to acknowledge that *even if* the Victims had previously engaged in prostitution and *even if* they were not chained and locked in his home, he capitalized off a system where young girls are prey for older men. The Victims went to him *because* he had a way to make them money, because he could offer them protection, a place to live, a place to prostitute, the ability to post advertisements on Backpage, phones that they could use for customers—things that, without the defendant, they would not have been able to access. The defendant has continuously tried to sidestep his own involvement, minimizing the fact that he was 33 years old at the time and that he should have known better than to try and embroil homeless teenage girls into his scheme. A significant sentence is therefore necessary not only to account for the defendant's offense conduct, which falls squarely within the statute's goals, but to make sure that he understands the impact and harm that he has inflicted, and to ensure that he does not engage in such conduct again.

## <u>CONCLUSION</u>

For the foregoing reasons, the Government respectfully submits that the Court should

sentence the defendant to a within-Guidelines term of imprisonment.

Dated: New York, New York
      June 17, 2021

Respectfully Submitted,

AUDREY STRAUSS
United States Attorney for the
Southern District of New York

By:        _____/s/_____
           Mollie Bracewell
           Elinor Tarlow
           Jacob Gutwillig
           Michael Herman
           Assistant United States Attorneys

Cc:     Defense Counsel
        (Via ECF)